[Civ. No. 203. Fourth Appellate District.—February 4, 1930.]

ANTOINE SINAN, Appellant, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Respondents.

Fred C. Peterson, Emmons & Aldrich and Glen S. Aldrich for Appellant.

E. W. Camp and Robert Brennan for Respondents.

SLOANE, P. J.—This is a case in which the decision on appeal rests chiefly on the sufficiency of the evidence to support the verdict of the jury, and in which, it is conceded by both plaintiff and defendant, there is no conflict in the evidence.

The verdict was for the defendant and the correctness of such verdict must rest upon the justification from the undisputed facts for the inferences and conclusions which must have been arrived at to support the verdict.

As the testimony of the numerous witnesses, shown in the bill of exceptions, is in substantial accord, nothing is to be gained by reviewing such testimony in detail.

The concensus of the separate narrations as to the facts pertaining to the accident is as follows:

On the second day of December, 1922, train 22 of the defendant Railway Company departed from Ferry Point, on San Francisco Bay, bound for Barstow, California. Plaintiff was a passenger on this train at the time and place of the accident. While the train was moving southerly about four miles north of the city of Bakersfield, it was derailed and the plaintiff thereby received the injuries complained of.

The roadbed at the scene of the derailment was practically level, without curves and was rock-ballasted and in good condition. The train passed the station of Shafter at 5:21 P. M., a distance of sixteen miles from the scene of the wreck, and arrived at the place of the accident at 5:37 P. M., after dark, covering the intervening distance in sixteen minutes. The rate of speed on the approach to the point of derailment was variously estimated by witnesses at from forty-five to sixty miles per hour. The accident occurred at a junction of the main line, with a little used spur-track known as the Shattuck-Nemo spur, which was

connected with the main line by the usual switching appliances.

This spur-track had not been used for a considerable period of time, and the switch not only was kept locked, but a spike had been driven at the point of connection of the spur rail with the main line, so as to furnish an additional safeguard against opening the switch. On reaching this point, the engine and train ran in and upon the spur-track and was derailed, the engineer killed, the fireman injured so that he died soon after, and the injuries complained of inflicted on the plaintiff.

Immediately after the accident an inspection disclosed that the switch was open so as to deflect the moving train from the main line upon the spur-track, thus causing the derailment. The switching device was, however, found locked, and the signal lights attached were found burning, with the green light facing the approaching train, and other signal devices in place, indicating that the main track was open for passing trains.

The position and operation of these signals is explained in the testimony as follows: Testimony of L. E. Heaster, a brakeman on the wrecked train, who examined the switch and signals immediately after the accident (Tr., fol. 122 et seq.) : "When I examined the switch I found it was locked, and that the switch and signals were in a position for a clear main line track. When I first observed the connecting rod of the shuttle box which operates the electrical signal device, I found it disconnected, lying on the ground with the bolt missing therefrom, and the cotter pin was gone. The same situation existed with respect to the pitman rod—it was resting on the ties, with the bolts and other appliances used to connect it to the pitman rod missing."

Other witnesses testified to the same effect as to the condition of the switch and signaling devices immediately after the wreck.

The record on appeal does not make the relation of these parts to each other very clear to the layman, but it appears that photographs and diagrams not included in the transcript were displayed to the jury, purporting to give the jurors a clear understanding of the situation.

To quote another of several witnesses who testified to practically the same conditions immediately following the

accident, the witness Clark, a porter on the train, in the employ of the Pullman Company, testified: "I saw the light on the switch-stand was showing east and west and saw it was clear. I looked underneath and saw this switch was thrown, which would cause the train to go on the switch instead of the main line, and the bolts were disconnected from the rod, between the rods from the switch-stand to the rails, and at that time I called the conductor's attention to it. He and I and some other passengers went there again to look for bolts, but we did not find any. I do not know the technical names of the rods or appliances, but the rod that reaches from the switch-stand over to the rails, and the rod that reaches from the electric box to the rails was disconnected. They had been disconnected by the removal of the bolts and the rods were lying on the ground."

The evidence also discloses that the spike which had been driven to hold the switch closed had been bent over to such an extent as to permit the switch rail to pass over it. It also appears that another south-bound train had passed this point safely a few hours previously, indicating that the switch was not open at that time.

We do not see how the jury could reach any other conclusion than that the wreck was caused by the train running into an open switch.

Some contention is made that the switch might have been thrown by the operation of a car wheel with a sharp flange, concerning which there was some evidence. But appellant concedes that there was sufficient conflict in the evidence to justify the jury in rejecting that theory.

The question next presents itself: Who was responsible for the open switch? Appellant contends, and respondent concedes, that the doctrine of *res ipsa loquitur* applies to this accident, and that the presumption of negligence rests on the defendant, and to rebut such presumption, the burden was on the defendant to satisfy the jury that the open switch was not the result of lack of due care and diligence on the part of the employees and servants of the railway company. Respondents claim to have met this requirement by showing facts justifying a finding that the displacement of the switch was an act of malicious vandalism on the part of persons unknown.

The controversy on this appeal rests chiefly upon the sufficiency of the evidence to support this implied finding of the jury.

There are two other theories on which the jury might have acted, either of which would have established the liability of the defendant.

First, that defendant's employees, within the scope of their employment, had left the switch open, after removing and negligently failing to replace the disconnected parts of the switching apparatus; or

Second, that the defendant company had sufficient opportunity and notice to have enabled it in the exercise of due care and diligence, to have discovered the dangerous situation in time to have averted the wreck.

There is no direct evidence to support the first of these theories, and the extent of the disarrangement of the appliances, the number of detached parts and the fact that so short a time had elapsed since trains had passed safely over this part of the road, rendered such situation extremely improbable. It is inconceivable that this switch could have been left in the condition shown by the evidence by the mere negligence or carelessness of an employee. The combination of displacements points more logically to a deliberate act of sabotage.

On the second theory, while extreme care and diligence are required of the railroad company in keeping its track in a safe condition, it is not an insurer of the safety of traffic. The evidence discloses that inspection of the track and switches was made daily by the company in the manner and at intervals accepted as adequate and customary in such matters. Such inspection, of course, cannot require the oversight of every foot of the roadway during every hour of the day. It does not appear very clearly just when this particular switch was inspected prior to the accident, but there is evidence that some time, during the day one Medina, a trackwalker for the railway company, had made a report to one of his superiors to the effect that the spike heretofore referred to had been driven at the switch as an additional safeguard against accidental displacement of the rail. It appears that the using of such a spike was customary at spur-tracks which were infrequently used.

■ Appellant argues that with knowledge that this spike had been driven, it was incumbent on the defendant company to have immediately sent someone to inspect the switch, or to have notified traffic on the road of the position of the spiked rail. The defendant Frank Stewart, a foreman in the Bakersfield yards of the defendant company, testified as follows: That at about noon of the date of the accident, a trackwalker by the name of Jesus Medina, came into the yards at Bakersfield on his track-walking velocipede, and told the witness Stewart that he, Medina, had spiked the switch at the spur across the river. The witness testified that the only spur within the jurisdiction of Medina across the river, was the spur at which the accident occurred. Stewart then endeavored to find Welsh, the timekeeper, but failed to do so, and did not report to any official of the company that he had received the statement of Medina. He made no effort to telegraph the train-master at Fresno that the switch had been spiked.

A rule of the railroad company, No. 600, provides as follows: "In case it becomes necessary to spike a switch, the trainmaster must be advised by telegraph or telephone as soon as possible, and also advised when switch is ready for use."

Archibald Wood, train-master of the defendant railway company at Fresno, the official to whom the report should have been made, testified that no reports were made to him as train-master; nor to his office, that the Shattuck-Nemo spur had been spiked by any person. He also testified that in the event a switch had been spiked and a report made to him thereof, a special bulletin of caution would have been issued to the operating crew of every train which would pass over the spiked switch from the time the report was received by the train-master until a further report was received that the switch had been repaired, and it would then be the duty of the train operators to run at a slow rate of speed and use caution over the spiked switch.

The circumstances just narrated evidence some degree of negligence on the part of the employees of defendant in conforming to the rules of the company, but we cannot say as a matter of law that any failure in this regard proximately contributed to the accident. It was a matter to be considered by the jury, as to whether there was actionable

negligence in this respect. There is nothing in the record to indicate that in this particular instance the presence of the spike in question added anything to the danger of the situation. The practice of spiking the switch rail at unused switches would seem to be a very reasonable precaution against possible accidental displacement of the switch rail, but the evidence discloses that the ordinary switching appliances which existed at this point are deemed entirely adequate at the numerous switching stations along the railroad. Had notice of the presence of this spike been given to the train crew in advance of the accident, it is possible that the train would have approached the spur-track in question with a degree of caution which might have prevented the accident, notwithstanding the signal lights showing · an open track on the main line. But we think it was for the jury to determine whether there was negligence on the part of the railroad employees in failing to advise the proper authorities under rule No. 600 quoted, or whether or not the presence of this spike, in view of the other evidence relating to the displacement of the switch, in any way contributed to the wreck.

If the switch itself had not been tampered with, it would under usual circumstances have been a sufficient safeguard against accident, irrespective of the presence or absence of the additional precaution of the spike.

We do not find any support in the evidence for appellant's claim that Medina's report of having spiked the switch rail resulted from his finding the switch out of order, or that he did find it out of order or so reported.

Of course, if he did so find, his failure to report to that effect in the due course of his employment, would establish negligence on the part of the railway company. ■■ The mere spiking of the switch rail would raise no inference that the switch itself was out of order as the testimony shows that it was a customary precaution at unused side-tracks.

■■ It is our conclusion that the verdict of the jury exonerating the defendant company from liability rests on the sufficiency of the evidence to justify a finding that the wreck was caused by an act of vandalism by someone not acting in the course of employment as a servant to defendant and of sufficient evidence to disprove a presumption of negligence in discovery.

Counsel for appellant have gone into the law relating to the degree of proof necessary to sustain a finding of sabotage, with much industry and research. It is their contention that the evidence on this point was insufficient to overcome the presumption of negligence resting upon the defendant under the doctrine of *res ipsa loquitur.*

The burden was on the defendant company not only to satisfy the jury that the wreck was caused by malicious tampering with the switch, but that the company was not guilty of negligence in failing to discover the condition of the track in time to avert the accident. Counsel for appellant cite the case of *Chicago, M. & St. P. Co.* v. *Irving,* 234 Fed. 562, as indicating the degree of proof required to sustain a defense of vandalism. The opinion in that case recites:

"The defense relied upon evidence largely circumstantial, tending to show that some person unknown to it had deliberately pulled some spikes, removed angle bars and displaced a rail. This may have been a correct way of accounting for the derailment, but the reasonableness of such a conclusion was evidently not clear to the jury and to the district judge, and as we read the testimony, is by no means a satisfactory explanation to us."

The difficulty in applying this case to the situation here presented is that the jury there found for the plaintiff, evidently rejecting the defense of vandalism, and the appellate court merely holds that such a finding by the jury was justified by the evidence. In this case if the jury had found on this issue for the plaintiff, we would not be in a position to dispute the correctness of their verdict. ■ Where the evidence is sufficient to raise an issue for the jury, it is not the province of the appellate court to disregard its findings.

The case of *Norton* v. *Galveston, H. & S. A. Ry. Co.,* (Tex. Civ. App.) 108 S. W. 1044, 1046, is also relied upon by appellant.

In that case the only issue presented by the petition was the unsafe condition of the track by reason of a failure to properly spike and tamp the ties, and to fill in between them and surface the same where old ties had been removed and new ones substituted, this being the only ground of negligence presented by the pleadings in evidence. Under its general denial, the defendant sought to show that it employed skilful track men to care for the track, and that they

performed that duty in a careful and prudent manner the day before the accident occurred. The defendant also set up the defense that the wreck in question was caused solely by reason of the act of some person or persons not connected with the defendant company. The verdict and judgment was for the defendant. The issue of vandalism was submitted to the jury under an instruction that "if you believe from the evidence that defendant's train, upon which plaintiff was a passenger, was derailed solely by reason of the act of some person or persons not connected with the defendant company, you must return a verdict for the defendant." The appellate court held that there was not sufficient evidence of vandalism to justify the submission of this issue to the jury. The only evidence on this point was that the employees of the company had left a push-car and tools at the place where the wreck occurred. The push-car was found on the morning of the wreck about 600 or 700 feet east of where it had been left. It required from two to four men to put the push-car on the track. It was down a dump near the track. It was not shown that any of the tools had been molested or used. The opinion says:

"We do not think the facts raise the issue. That the push car had been lifted on the track by four or six men, carried 600 or 700 feet, and then dumped off down an embankment, merely had a tendency to show that persons had been at or near the place of the wreck before it occurred, and had moved the push car, did not tend to show any tampering with the track."

The opinion further states:

"The evidence raised merely a suspicion or surmise that wreckers might have caused the derailment, and that was not sufficient to warrant a submission of the question to the jury."

There was to all intents and purposes no evidence whatever on that point. The conclusion was that the submission of the question of vandalism to the jury was unwarranted.

The opinion further holds, as is the law of the instant case, that the burden of proving that the derailment took place on account of the track having been tampered with by malicious persons, rested on appellant, and carried with it the burden of showing that due care had been used in in-

specting the track so as to discover the defects. (Citing authorities.) The opinion continues:

"In submitting the issue to the jury the duty of inspection and care in discovering the dangerous condition of the track should be coupled with it, for proof of the track having been interfered with, without proof of the exercise of reasonable diligence in discovering the defect, was an imperfect defense."

In the instant case, as we have indicated, the evidence of vandalism was sufficient to go to the jury.

Another citation relied upon by appellant is that of *Houston and T. C. R. Co.* v. *Gaither,* (Tex. Civ. App.), 43 S. W. 266, 268, in which the allegation of vandalism as the cause of the accident, was pleaded in defense. The court says:

"The testimony of the defendant on this issue tended to show that the switch was in good condition, but that the bolt had been abstracted by some person not under the control, and without the knowledge of the railway company. The evidence was amply sufficient to justify the jury in reaching the conclusion that the switch was out of repair, as contended for by plaintiff, and that the switch was open as a result of this defective condition."

But the court further held in that case: that "the evidence was sufficient to justify the conclusion that the switch had been defective for some time, and that the railway company was guilty of negligence in not discovering and remedying this defect. Though the jury might have believed and accepted the theory of the defendant that the rod was abstracted by some person alien to its employment and without its knowledge or consent, still the evidence indicated that the employees of defendant were not sufficiently watchful as to the condition of this switch, and the jury were warranted by the evidence in concluding that the railway company was guilty of negligence in not discovering that the switch was out of place."

Here again is a verdict accepting the theory of a malicious displacement of a switch by the vandalism of the third party, but at the same time holding against the defendant on the issue of sufficient opportunity and negligence in remedying the defect. The court in this connection says:

"Though the jury might have believed and accepted the theory of the defendant that the rod was abstracted by some

person alien to its employment and without its knowledge or consent, still the evidence indicated that the employees of defendant were not sufficiently watchful as to the condition of this switch, and the jury were warranted by the evidence in concluding that the railway company was guilty of negligence in not discovering that the switch was out of place.''

In this connection it is the contention of appellant that the consideration of the question of negligence on the part of the defendant subsequent to the malicious interference with the switch was improperly presented to the jury under an instruction XVI, excepted to by the plaintiff, which predicated the nonliability of the defendant solely on the issue of vandalism. This instruction reads as follows:

''If you find by a preponderance of the evidence that the accident to the train referred to in the complaint and described in the evidence, and the derailment thereof, were caused by the act of third parties who were not employed by defendants or either of them, then you will at once return a verdict in favor of the defendants, because the defendants would not be liable for the malicious acts of third parties.''

Appellant's argument is that this instruction entirely relieves the defendant from any showing as to opportunity or diligence in discovering the condition of the switch in time to have averted the accident. It is argued that this instruction placed the liability of the defendant company solely upon the defective condition of the switch, caused by parties for whom the defendant was not responsible, without taking into account the question of reasonable opportunity to have remedied the defect in time to have prevented the accident.

Unless this omission is remedied by other instructions given at the trial, the omission was a serious one. Notwithstanding there may have been evidence before the jury to show that the defendant was without negligence in failing to discover and report the displaced switch, this instruction clearly eliminates the consideration of such evidence by declaring unequivocally that a finding of the derailment of the train by the act of third parties not employed by defendants, entitled defendants to a verdict in their favor, irrespective of subsequent negligence in failing to discover and repair the

displaced switch. We fail to find elsewhere in the instructions anything calling attention of the jury to the fact that proof of vandalism causing the accident should be accompanied by evidence showing that the accident could not have been averted by the exercise of due care and diligence on the part of defendant.

The jury may well have found from the evidence that the defendant railway company was not responsible for the displacement of the switch, and have been led by the instruction to disregard or at least fail to take into account whether or not there was subsequent negligence in failing to discover the condition of the track in time to replace it or warn the train crew. As hereinbefore held, there was sufficient evidence on this point to make it a question for the jury.

It is true that the jury was elsewhere instructed in general terms that if they found that the derailment occurred by reason of a defect in the appliances, or a failure to keep the appliances used by the defendant in repair "and if you find that the defendants were negligent in failing to discover, or in failing to remedy such defect, the mere fact of the employment of an inspector will not release the defendants from the consequences of that negligence." If this instruction had concluded with the admonition "that the mere fact that the disrepair of the switch was caused by a malicious act of vandals would not relieve the defendants from the consequences of that negligence, without a showing of diligence in discovering and repairing the defect" it might have supplied the omission complained of in instruction XVI. In spite of the instruction last above quoted, the jury might well have understood that negligence in failing to discover and remedy the defect did not apply where the direct cause of the accident was occasioned by trespassers.

The doctrine seems to be accepted in this state that an instruction directing a verdict under given conditions must include all the conditions necessary to support such verdict, and that an omission of a material matter of consideration cannot be cured by reference thereto in some other instruction. A recent statement of this rule by the Supreme Court is contained in the opinion in *Douglas* v. *Southern Pac. Co.*, 203 Cal. 390, 393 [264 Pac. 237]. The court says:

"The authorities are legion to the effect that a so-called 'formula' instruction must contain all the elements essential to a recovery, and the absence of any one of such elements may not be compensated for nor cured by a reference thereto in other. instructions correctly and fully stating the law.

"This principle is well stated in *Beyerle* v. *Clift,* 59 Cal. App. 7, 9 [209 Pac. 1015], wherein it is held that 'if an instruction by its terms purports to state the conditions necessary to a verdict, it must state all those conditions, and must not overlook pleaded defenses on which substantial evidence has been introduced. "It is clear that an instruction directing a verdict for the plaintiff in the event that the jury finds certain facts to be true, must embrace all the things necessary to show the legal liability of the defendant and to warrant the direction or conclusion contained therein that plaintiff is entitled to a verdict, and such is the rule in this state." ' "

In *Pierce* v. *United G. & E. Co.,* 161 Cal. 176, 184 [118 Pac. 700, 704], it is said:

"It is clear that an instruction directing a verdict for the plaintiff in the event that the jury finds certain facts to be true, must embrace all the things necessary to show the legal liability of the defendant, and to warrant the direction or conclusion contained therein that the plaintiff is entitled to a verdict, and such is the rule in this state. . . . It is true that other instructions were given at the request of defendant that stated the law in these respects as favorably to defendant as was warranted, if not more favorably. But the giving of these other instructions simply produced a clear conflict in the instructions given the jury by the court, and it is impossible for us to say which instruction the jury·followed in arriving at a verdict in favor of plaintiff. . . . "

The rule is that where an instruction directs a verdict if the jury finds certain facts to be true, it must embrace all the things necessary to show the legal rights or liability of the party in whose favor the verdict is directed to be returned.

Other California authorities bearing on this point are: *Star* v. *Los Angeles Ry. Corp.,* 187 Cal. 270 [201 Pac. 599] ; *Keena* v. *United R. R. of S. F.,* 57 Cal. App. 124 [207 Pac.

35]; *Dunn* v. *Hines,* 50 Cal. App. 345, 350 [195 Pac. 276]; *Beyerle* v. *Clift,* 59 Cal. App. 7 [209 Pac. 1015]; *Humphfres* v. *Western Pac. R. R. Co.,* 173 Cal. 428 [74 Pac. 157]; *Killellea* v. *California Horseshoe Co.,* 140 Cal. 602 [74 Pac. 157]; *Darrell* v. *Mutual etc. Ins. Co.,* 44 Cal. App. 523 [186 Pac. 620]; *Rathbun* v. *White,* 157 Cal. 248–253 [107 Pac. 309].

Counsel for respondent cites a number of authorities to the general rule that instructions must be considered as a whole and that if the instructions thus considered fairly state the law, that the insufficiency of some single instruction will not be considered reversible error. We do not think that this general rule corrects the present situation. The instruction complained of definitely states a certain condition under which the defendant is entitled to a verdict, and unconditionally directs if that state of facts is found by the jury, that their verdict shall be for the defendant. Under this instruction the jury may well have understood that if the misplaced switch caused the accident, and that its displacement was occasioned by trespassers over whom the defendant had no control, that these facts alone required the verdict as directed.

Appellant assigns other grounds of error in the instructions, and in the admission of evidence, but we doubt if these points are well taken. In any event, in view of our conclusion that there was prejudicial error in giving instruction XVI, it is unnecessary to discuss the matter further.

The judgment appealed from is reversed.

Marks, J., and Barnard, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 24, 1930, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court, on March 31, 1930.

All the Justices concurred.