WALLAR et al. v. SOUTHERN PAC. CO. et al.

No. 21384–S.

District Court, N. D. California, S. D.
March 3, 1941.

476

E. C. Mahoney, of Burlingame, Cal., for plaintiffs.

A. B. Dunne and Dunne & Dunne, all of San Francisco, Cal., for defendants.

ST. SURE, District Judge.

Plaintiffs, husband and wife, seek to recover damages resulting from injuries to the wife alleged to have been caused by defendants' negligence. The action was brought in the state court and removed here because of diversity of citizenship. It was tried to the Court without a jury.

Plaintiff Mrs. Wallar suffered minor injuries while a passenger upon defendant Southern Pacific Company's train, which was derailed near Harney, Nevada, at 9:33 o'clock on the night of August 12, 1939. The train was a diesel-powered streamline, known as Train 101, "The City of San Francisco," consisting of seventeen units, numbered and named in the following order: S.F. Nos. 1, 2, 3, power cars; 101, baggage and dormitory; 401, chair car, "Market Street"; 601, diner and kitchen, "Presidio"; 602, diner, "Mission Dolores"; 701, dormitory club, "Embarcadero"; 120, sleeper, "Twin Peaks"; 121, sleeper, "China Town"; 122, sleeper, "Fishermen's Wharf"; 123, sleeper, "Golden Gate Park"; 124, sleeper, "Seal Rocks"; 125, sleeper, "Union Square"; 126, sleeper, "Telegraph Hill"; 127, sleeper, "Portsmouth Square"; 901, observation and lounge, "Nob Hill".

At the time of the accident the train was traveling westerly on a regular run from Chicago, Illinois, to Oakland, California. The derailment occurred on what is known as curve 613, at the east approach to bridge No. 5, over the Humboldt river, about a mile and a half east of Harney, Nevada, a railroad section crew headquarters, and about 3½ miles west of Gerald, Nevada, a railroad siding. Carlin, Nevada, is located 17 miles easterly.

The accident was reported to the Federal Bureau of Investigation, a division of the Department of Justice of the United States. The F.B.I. made an investigation of the wreck as an "interference by violence with the movement of trains moving in interstate commerce." As stated by the chief clerk in his affidavit setting forth portions of the report in evidence here, "This bureau, in the regular course of its business aforesaid undertook to investigate the circumstances surrounding the wreck of said train. Said investigation was conducted by special agents of this bureau who were sent to the scene of the accident, and who made observations and collected information and data at the scene of the accident and near the scene * * * and likewise said investigation was conducted by this bureau in its technical laboratory in Washington, District of Columbia, all as hereinafter more particularly appears."

The original report contains more than 850 pages. In addition to the portions of it in evidence, there are 202 photographs with descriptions.

The report shows that "the point of derailment was approximately 169½ feet east of bridge No. 5, over the Humboldt river, which was constructed with steel girder uprights. Although derailed, power units S.F. 1, 2 and 3, also S.F. 101, and car 'Market Street' (S.F. 401) crossed the bridge, the wheels riding the ties. The Railroad Board of Inquiry Report shows that S.F. 101, the auxiliary power unit and baggage car, struck the left post of Humboldt river bridge No. 5, near the middle of the car, and scraped its side from there to the end; also that the cars 'Market Street' and 'Presidio' had struck the corner of the bridge, causing the complete demolishment of the bridge. Cars 'Presidio', 'Mission Dolores', 'Embarcadero', 'Twin Peaks', and 'Fishermen's Wharf', dropped into the shallow water of the river, or into the dry river bed adjoining the stream. Cars 'Golden Gate Park', and 'Seal Rocks', were upright, but at a perilous angle on the south side of the fill. The front trucks of car 'Union Square' were off the rails, but the rear trucks had not reached the point of derailment. Cars 'Telegraph Hill', 'Portsmouth Square' and 'Nob Hill' were still on the rails.

"The records of the Southern Pacific Company indicate that the train carried 149 passengers, 40 train attendants and seven crew members, making a total of 196 persons; further, that as a result of this wreck ten passengers and fourteen employees were killed, and forty-five passengers and eighteen employees injured, making a total of twenty-four killed and sixty-three injured."

The operation of the train was in the Salt Lake division, with physical limits between Ogden and Sparks, Nevada.

Under a paired track agreement between the Southern Pacific and Western Pacific Railroads, all trains of both companies operating through the Humboldt river valley, between Alazon and Wesco, Nevada, travel west on Southern Pacific tracks and east on Western Pacific tracks, the tracks of the two companies closely paralleling each other in many places. The train was operating in paired track territory westward over Southern Pacific tracks.

Prior to the F.B.I.'s entry into the investigation, much of the wreckage was cleared away from the scene in order to permit track and bridge replacements. In addition to train passengers and employees and rescue workers, it was estimated that several thousand people visited the scene of the wreck on Sunday, August 13th. It is believed that many persons handled articles lying around the scene, and some of them may have been carried away by souvenir hunters. It was not until the afternoon of the 13th that sufficient deputy sheriffs, railroad and other officers arrived and made it possible to control the sightseers.

At the pre-trial conference held under the provisions of rule 16, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the issues, by agreement, were simplified as follows: The design and construction of, and materials going into, track, roadbed, and bridges were proper and adequate, and there was no negligence in these respects; there is no claim that any failure of the bridge was the cause of the accident complained of; the design and construction of, and materials composing the system of automatic train control signals were proper and adequate, and there was no negligence in these respects; on the occasion of the accident the signals functioned according to their design, and there was no signal failure which was the cause of the accident; as to the train, there was no negligence in respect of design, construction, or materials, and nothing in design, construction, or mechanical condition, or mechanical operation was a cause of the accident; the operating personnel had been adequately trained and had had proper experience, and there was no negligence in their operation of the train; there was proper supervision by the company of its employees, and its supervising officers were competent; plaintiffs make no contention with respect to the condition or inspection of the train prior to the accident, but reserve the right to inquire into the condition and operation of the brake system.

The case was tried upon the theory that the doctrine of res ipsa loquitur [1] applied. Plaintiffs rested upon a prima

---

[1] "In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as

facie showing, and defendants proceeded to account for the accident.

Defendants' theory is that the accident was caused by vandalism and not by any agency under their control.

Evidence in great detail was presented, showing the construction and operation of the train; the train movement between Ogden and Sparks; the physical characteristics of the country; detailed information as to the track, curve 613, and bridge No. 5.

The track had been relaid in 1931. A change was made from 90-pound to 130-pound rails. Ties laid in 1926 and 1928, found in serviceable condition, were left in the roadbed. All of the tie plates were changed.

Curve No. 613 is a simple, uniform, three-degree curve, 2090 feet in length; between the lower and higher rail the difference in elevation is 4 inches. The bridge was 123 feet long, built of steel in 1905.

The length of the train was 1292 feet. According to the engineer and the district road foreman, who were aboard "The City of San Francisco," the train was traveling 60 miles an hour, the speed designated as safe at the point of the wreck. The train was stopped by the electro-pneumatic brakes when the emergency was turned on, within a distance of 906 feet.

Testimony of the method and times of track inspection was introduced. The roadmaster made inspection several times a week. He made tours of inspection in his motorcar on August 4th, 7th, 10th, 11th, and 12th. He found the track in good condition. The bridge foreman and his gang had been working on bridge No. 5 for several days, leaving it on August 5th to work on bridge No. 4, 1160 feet distant. He and his gang passed over curve 613 four times on August 12th and found nothing wrong. A Southern Pacific freight train, between 6:10 and 6:20 o'clock that night, passed over the point where the wreck later occurred at 9:33 o'clock. The crew of the freight testified that they saw nothing unusual along the track.

Engineer Hecox thought the train had been derailed by striking a rock, and so reported to his superiors immediately after the wreck. He testified, in part, as follows:

"A. Well, about a mile after I was down to 60 miles an hour going around this 3 degree curve I noticed a tumble weed on the track, on the left rail, and that attracted my attention, as all weeds do, but when I struck the tumble weed I felt a jar, I couldn't tell whether I went up or down, and I immediately applied the brakes in emergency.

"Q. Is it unusual to see tumble weeds on the track? A. No.

"Q. Had you applied your brakes before you felt a disturbance in the running of the train? A. No, sir.

"Q. Up to that point how had that train been running? A. Same as it always did.

"Q. Did you notice anything peculiar about it? A. No, sir.

"Q. What was the condition of the track up to the point where you saw the tumble weed? A. Good.

"Q. What happened after you felt this disturbance in the running of the train and applied your brakes; what happened to the head end? A. Well, I felt a sort of a skidding sensation was all; I could see big streams of fire flying out on either side, and by that time the power unit came to rest; I had no unusual jar along there.

\* \* \* \* \* \*

"Q. Were you able to tell whether or not the lead truck on Power Unit No. 1 derailed? A. I knew it was.

"Q. Where did it derail? A. At the tumble weed.

"Q. Was that east of the bridge? A. Yes.

"Q. How did it ride from there on? A. Well, just a skidding sensation; you could feel it sliding."

When the train stopped the engineer got out of his cab. "I could see the track was all bare and the bridge was gone," he testified, "and I couldn't hear any—I could

---

sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff.

"Such, we think, is the view generally taken of the matter in well-considered judicial opinions." Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815, Ann.Cas.1914D, 905.

see the cars were piled up down there, but I couldn't hear a sound, and I says, 'My goodness, I guess they are all dead,' so I ran to Harney."

Upon the question of vandalism, evidence was offered tending to prove that two unknown persons, between the hours of 6:30 and 9 P.M., deliberately derailed the train. After the wreck, 169 feet east of bridge No. 5, on curve 613, it was found that bolts of the angle bars holding the joints of the rails had been removed; spikes had been drawn from the receiving rail for approximately half its length, the rail moved over 4⅝ inches and spiked down; the leaving rail appeared untampered with; brown paint had been smeared on the top or ball of the receiving rail for a distance of 26 feet.

The situation thus briefly described was discovered about two hours after the accident by C. A. Fogus, district road foreman and supervisor of the power department, who was aboard the train. Thereafter it was viewed by train employees and others, and numerous photographs, which are in evidence, were taken. Mr. Fogus testified in part as follows:

"Q. Now, will you please describe for us as fully as you can the conditions that you saw at that time underneath that fourth car[2] from the rear end? A. I held the fusee in front of me, and got down on my knees, and rested my hands under the car so's to take a good look, and tried to ascertain what it was all about. I noticed the west rail or receiving rail had been shoved clear over to the north rail, or the right-hand rail, and then I looked at the end of the rail and I saw the rail joint plates that hold the ends of the two rails together were off. They were not on the rail at all, and then I thought, 'Well, maybe we cut the bolts off,' and I looked for bolts, and I couldn't see any bolts that held these two plates on the rail. Then I noticed the bond wires or the electrical connection wires from one rail to the other that operates the automatic signals, that they were stretched out at an angle, and were broken off at the west end. They were broken off of the receiving rail for us. They were still intact on the good rail that was left, and I noticed a tie plate, a

plate that is placed on the tie that the rail rests on, that is spiked with four spikes, had been lifted off and shoved inward, and that was on the first tie beyond the end of the rail on which we were running.

"Q. You mean the rail that was in place? A. The rail that was in place, the leaving rail. Then I looked down where the rail should have been, and I saw spikes had been removed for approximately half the rail length, maybe out of eight or ten ties, I couldn't say for sure.

"Q. Now, which spikes had been removed? A. Off the inside, off the inside of the south rail.

"Q. Did you see the angle bars, the bars that connected the two rails? A. No.

"Q. Did you look for them? A. No, I didn't.

"Q. What was the condition of the ballast right at the end of the rail that was in place? A. Right at the good rail it was all intact, but beyond that it was disturbed.

"Q. What type of disturbing? A. Where the wheel had dropped down and began churning it up.

"Q. What was the condition at that time of the end of the south rail which was in place, the leaving rail? A. It was turned partially over, and I didn't make a close inspection, because that would be on the north side, and it was almost impossible to get under there, because the head end of the car headed down the bank on the south side.

"Q. You are talking about the receiving rail on the south side. A. Yes.

"Q. I want to know what the condition was at the end of the leaving rail, the delivery rail. A. The end of the leaving rail was perfect. There wasn't anything wrong with that.

"Q. Any scars or scratches on it? A. I couldn't see any scars, didn't notice it. Mind you, I didn't make a very close inspection. I am holding a flash torch up, red fusee, and I am doing the best I can. I saw there was something radically wrong, and tried to figure out what it was.

"Q. Now, did the cars on the 'City of San Francisco,' on the side, have any skirts,

---

[2] "Union Square," the fourth car from the end of the train, the front trucks of which were off and the rear trucks on the track. This was at the point of derailment, near where the train parted and the bridge and several of the cars went into the river.

which came down below the floor level of the car? A. Yes, they do.

"Q. And how close, approximately, to the top of the rail do those skirts come? A. Oh, the thickness of your body. They must be twelve inches or fourteen inches from the rail.

"Q. In the position in which you found that car, what was the distance from the bottom of that skirt to the ground? How much space did you have to crawl in there? A. Well, you would have to lie down flat to get through there.

"Q. Is that the way you got in? A. That is the way I got in. That is why I didn't crawl clear through to the north side.

"Q. And after you got in there above the rail, at the place where the rail came to an end—the rail that was in place came to an end, how much space was there around you to move around in? A. Oh, anywhere between fifteen and twenty inches.

"Q. How long did you remain there? A. Well, I got pretty nervous. I didn't remain there very long. And as soon as the engineer came I showed him what I found, and I think I remarked to him, 'There is something screwy here, come see what you think about it.'"

When the receiving rail was moved 4⅝ inches, it was placed upon a standard intermediate tie plate and fastened with four spikes, two insecurely driven into the tie. (Intermediate tie plates are placed beneath rails except at rail joints, which are kept in place by angle bars.) The intermediate tie plate found at the derailment point did not fit the impression in the wood left by the original tie plate when the rail was in normal position. In an unsuccessful effort to establish the source of the derailment tie plate, an examination was made by the F.B.I. at the scene of the wreck of 121 tie plates which had been torn out. It is the theory of defendants that the bond wires were undisturbed so that the signal system operated; and thus was made what, in railroad parlance, is called "a perfect derailer."

At the point of derailment Engineer Hecox found an iron claw bar, 59 inches in length, used for drawing railroad spikes. A few feet down the bank of the fill he found a green tumbleweed. "I was looking for the tumbleweed," he said, "when I saw the claw bar." "It was a Russian thistle about three feet in diameter." "It had been pulled up and had a long root on it." Near the point of derailment two wedge-shaped blocks of wood were found; through one, two nails had been driven, and through the other, a single nail. It is suggested that with the aid of these blocks the tumbleweed was fastened to the ties where the tracks were spread, and that the paint which had been smeared upon the ball of the displaced rail simulated a shadow obscuring the engineer's view of the shining rail ahead.

As was to be expected, an intensive search was made at the scene of the wreck and of the surrounding country for clues which might lead to the apprehension of the supposed vandals. Some time after the tragic accident the bed of the Humboldt river was raked 900 feet downstream from bridge No. 5. An iron claw bar, which had been used in the repair of bridge No. 4, was found in 5 feet of water. There was also found an iron bar 2 feet long and 1 inch in diameter, recognized as a handle for a buda journal. A small roll of wire was recovered. A blue cloth zipper jacket, weighted with rocks, was next brought to the surface. A spike maul, described as a ten-pound hammer with a wooden handle 36 inches long, was found buried in the gravel. It was necessary to use shovels to release the hammer-end of the maul. It appeared to be wrapped in a burlap sack, which proved to be a canvas zipper-type jacket. As the garment came out of the water a track wrench, 37 inches in length, slid from its folds and was recovered. The jacket was tan colored, and on its left front side there was a dark stain. Both jackets were of the type worn by laborers. Other tools were found, which it is unnecessary to mention, but all bore evidence of having been used by bridge repairmen or section gangs employed by the Southern Pacific. It is the theory of defendants that the tools found near the point of derailment and in the river were stolen from defendant railroad company and were used by two vandals in displacing the rail which caused the wreck.

Near the point of derailment a tin lid from a paint can was picked up by Chief Engineer Kirkbride of the Southern Pacific Company. This was an important find. Impressed in the lid were the letters and figures, C 1539-16A. The lid had mahogany colored paint upon it. It was turned over to the F.B.I. who found that it was identical with lids on cans of mahogany enamel manufactured by the

Con-Ferro Paint Company of St. Louis. Many witnesses who inspected the track at the point of derailment saw mahogany colored paint on the top and sides of the displaced rail under the car "Union Square". Witness Comer crawled under the car to see the "separation." He put his hands upon the displaced rail and felt something wet and sticky. The red fusee gave it the appearance of blood. But when he held the light closer, he saw that the substance was of a brownish color and smelled like paint. The F.B.I. bureau laboratory found that there was mahogany colored paint on the stained tan zipper jacket. By spectrographic analysis it was determined that the mahogany paint upon the displaced rail, the tan zipper jacket, scrapings obtained from beneath No. 1 power unit which it is believed was deposited on the under structure as it passed over the displaced rail, and the paint on the can lid, were all similar in composition and color. Extensive investigation of the sale and distribution of this paint was made in the states of California, Nevada, Oregon, Idaho, Arizona, and Utah. A sample of mahogany enamel obtained from the Con-Ferro Paint Company and reported by it to be from the same batch as that on the can lid was found to be of the same color and composition as the paint on the lid. "This identification," says the F.B.I. report, "has greater significance in view of the fact that 198 samples of paint obtained from the vicinity of the derailment and from railroad supplies were found to be different from the paint on the can lid and therefore were definitely eliminated."

■ This evidence alone persuasively supports defendants' theory that the wreck was caused by vandalism and not by an agency under their control. The res ipsa loquitur doctrine disappears where there is intervention of third parties. Brunell v. Mountain States Power Co., 9 Cir., 81 F.2d 305, 306; Hagan & Cushing Co. v. Washington Water Power Co., 9 Cir., 99 F.2d 614, 616.

■ As against defendants' showing that the wreck was due to an extraneous act which defendants could neither prevent nor guard against, plaintiffs argue that the evidence of derailment was fabricated by employees of defendant railroad company after the accident. While no direct charge of venality is made, plaintiffs urge that the evidence is susceptible of such an inference, as well as that of sabotage. If the facts

are consistent with either of two opposing theories, neither is proven. In such event, "judgment * * * must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other." Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819.

Plaintiffs offered in rebuttal the testimony of Joe Bell of Beowawe, Nevada. Bell hurried from a dance to the scene of the wreck at about midnight. He testified, in part, as follows:

"Q. Tell us what you saw as you approached the wreck? A. Well, we come over the hill, we could see fires burning, bonfires; there wasn't a sound, I couldn't hear nothing back there. You could see people standing around the fires when you got down a little closer, and I could hear some pounding, like pounding on iron or some kind, but I didn't think nothing of it, expect something like that at a wreck.

"Q. Did you note the direction from which this pounding was coming? A. It was toward the back end of the train, the east end of the bridge, and we walked on down and when we got to the wreck there was people laying on the sand bar just below the bridge, on the east side of the bridge. We stopped and talked to the people; they wanted to know if any of us was a doctor. We said no. We said, 'Are you badly hurt?' 'Well, not too bad; there is people on the other side that are worse than we are that need a doctor.'

*      *      *      *      *

"Q. Did you see anybody there? A. Yes. Right underneath the cars was Bianchini, or Bianchini's twin brother, was sitting right in the middle of the track, or the rails, with his back kind of sideways to me, and there was two or three, I can't say just which, on the other side of the south rail, you see, they were sitting there or kneeling, I can't tell you exactly who.

*      *      *      *      *

"Q. How long did you stay there, Mr. Bell? A. Well, now, just maybe ten to fifteen seconds, maybe; maybe more; I couldn't tell you exactly.

*      *      *      *      *

"Q. What did you do then? A. Well, we just stayed there a minute and I saw the wreck and all on the other side of the river, and in the river; then I waded the river and went across to the other side."

Joe Bell, Jr., aged twelve, who accompanied his father, testified that when he ap-

proached the wreck he heard some pounding, but that he didn't pay much attention to it and he didn't know where it came from.

Joseph Bianchini, residing at Harney, is a section foreman for defendant railroad company. He was awakened by Engineer Hecox at about 10 o'clock and told of the accident. He assembled his gang and after Hecox reported the accident by telephone to the train dispatcher, all, including the engineer, went by track motorcar to the scene of the wreck. Immediately upon arrival Bianchini conveyed Fogus by track motor to Harney where further report of the accident was made to railroad headquarters. Later, at about 1 o'clock, Bianchini and Fogus returned to bridge No. 5. Bianchini arrived at the point of derailment at about 1:30 o'clock in the morning, and examined the displaced rail. It may have been about this time that Bell arrived and saw Bianchini and others under car "Union Square".

The testimony offered to support the theory that the evidence of derailment was manufactured after the wreck by employees of defendant railroad company is wholly insufficient and insubstantial. A suggestion so incredible cannot be sustained against the indisputable physical facts and testimony of unimpeached witnesses to the contrary.

Defendants called several witnesses in surrebuttal. Mrs. L. E. Deiley was a passenger with a berth in car "Golden Gate", sixth from the end of the train. She was in the observation car with a number of other passengers when the accident happened. About ten minutes after the train stopped she got out of the observation car and walked to the east embankment of the river where a large bonfire was burning. This was at the point where the train had parted and the bridge was destroyed. The car "Union Square" beneath which the displaced rail was discovered was about two car-lengths distant. There was a second bonfire on the fill about a car-length distant from the point of derailment. Witness was in the vicinity with other passengers until 3 o'clock in the morning. She saw the conditions under car "Union Square".

"Q. Tell us very briefly, if you will, please, what you saw there? A. There were men on the north side,—no, the south side of the track, as you look west it was on the left. There were men under the car with lights. They weren't under the car directly, but to one side, and the north side of the car was perfectly free, so I could see from that side that the rail had been pushed over against the north rail, and I could tell that the tie plate had been removed and re-spiked, and on the north side of the tie plate were two spikes that were out four or five inches, they were that high, they weren't pounded all the way in as is usually done. The other two on the south side were clear in, more down, like.

"Q. Now, Mrs. Deiley, this fire to which you went, the second fire, how far away was it from that place where you saw those conditions? A. That was about a car length, or a little bit less.

\* \* \* \* \*

"Q. Mrs. Deiley, at any time that night after you first got off the car onto the ground, while you were walking back of the train, then when you came up to the abutment where the first fire was, at any time when you were there at the second fire did you at any time hear any sounds of hammering near you? A. No.

"Q. Did you hear any sound of metal striking metal near you? A. No, I didn't.

"Q. Did you hear any sound of metal striking metal or pounding in the direction of car 'Union Square'? A. No, sir.

"Q. Or from under that car? A. No, sir."

Edmund Becker was a passenger in car "Seal Rocks", fifth from the rear end, immediately west of car "Union Square". He looked at his watch as he stepped to the ground after the accident and it indicated 10:05. He walked to the edge of the river where the bridge had gone out. A bonfire had been started. "I spent practically all of my time around there," the witness testified. "Right around the outside of the car, back and forth along the side of the train." "How long were you there? A. We were there in and around there all night, until the early morning, when the last three cars of that part of the train were taken away." The witness saw the displaced rail. He heard no pounding of any kind "coming from under" car "Union Square". "The only pounding I recall is the pounding I heard when someone climbed up on the roof of the car which was on the bridge and used a sledge and leaned over and knocked out the window of that car."

It is further argued that the train was running behind schedule; that because of the speed of the train, "the tremendous strain was too much for a weak spot in

curve 613 and it gave way"; that after exhaustive investigation by railroad police, the F.B.I. and Nevada state authorities no persons have been found that were connected with the purported crime; that there are discrepancies in the evidence, particularly with regard to the use of a buda-jack in moving the receiving rail; that it should be borne in mind that most of defendants' witnesses were employees of defendant railroad company at the time of the accident.

"While extreme care and diligence is required of the railroad company in keeping its track in a safe condition, it is not an insurer of the safety of traffic." Sinan v. Atchison, T. & S. F. Ry. Co., 103 Cal.App. 703, 284 P. 1041, 1043. It is true that the train was twenty-nine minutes late, but there is nothing showing that the engineer was exceeding the train speed schedule; all evidence is to the contrary. To say that there was a tremendous strain due to speed on the curve in consequence of which the tracks spread is pure guesswork and in direct conflict with the physical facts and circumstances found after the derailment. A judgment may not rest upon mere speculation and conjecture. Pennsylvania R. Co. v. Chamberlain, supra, 288 U.S. at page 344, 53 S.Ct. 391, 77 L.Ed. 819. Numerous crimes have been committed where the offenders have escaped apprehension. The culprits here may yet be arrested. Where many witnesses to a happening are examined, it would be strange indeed if there were not some discrepancies in the evidence. The fact that a number of the witnesses were employees of the defendant railroad company at the time of the accident does not, under the circumstances here disclosed, impair their credibility or affect the weight of their testimony. Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 216-220, 51 S.Ct. 453, 75 L.Ed. 983, cited in Pennsylvania R. Co. v. Chamberlain, supra.

Plaintiffs further argue, "admitting that the defendants have made a satisfactory explanation of the cause of the wreck," nevertheless they were still negligent. Plaintiffs claim that the block signals were inadequate because the bond wires uniting the rails and forming a part of the signal system were too long, permitting the rails to be moved without severing connection. "Such condition," plaintiffs say, "could have been avoided by using shorter wires or a rigid connection between the rails."

The signal system installed and in operation was in accordance with law and approved railroad practice. Ordinary track laborers on a railroad soon become familiar with railroad signal systems and their operation, and they would have no difficulty in making a workable connection whether the bond wires were short or long, or whether there was a rigid connection between the rails. The operation is a simple one and evil-minded persons, bent on effectuating derailment, could easily perform it. Furthermore, a complete answer to this contention is found in the order settling the issues at the pre-trial conference where counsel for the respective parties stipulated: "It is agreed that the design and construction of, and the materials going into, the system of automatic train control signals were proper and adequate; that there was no negligence in these respects and that on the occasion of this accident the signals functioned according to their design and that there was no signal failure which was a cause of the accident complained of."

It is charged that defendants violated a Nevada statute [3] providing that a locomotive must be equipped with a headlight of at least fifteen hundred candlepower, etc. The short answer to this is that the state law does not apply here because Congress has occupied the field. Napier v. Atlantic Coast Line, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432. State law must yield to Federal law. Louisville & N. R. Co. v. State, 16 Ala.App. 199, 76 So. 505, 514. The state law is suspended by 45 U.S.C.A. §§ 22-34. Franklin v. Nowak, 53 Ohio App. 44, 4 N.E.2d 232, citing Napier v. Atlantic Coast Line, supra.

The evidence shows that in the equipment and operation of defendant railroad company's locomotives or power units, defendants have fully complied with the Federal laws.

Upon a careful consideration of the whole case I am of the opinion that plaintiffs have failed to sustain the burden of proof by a preponderance of the evidence.

---

[3] § 1, Act of February 28, 1913, Chap. 32, Nevada Statutes, 1913.