[Civ. No. 23181. First Dist., Div. Three. June 12, 1967.]

ALLEN D. TOOLE, Plaintiff and Respondent, v. RICHARD-SON-MERRELL INC., Defendant and Appellant.

Bronson, Bronson & McKinnon, Harold R. McKinnon, Lawrence E. Walsh, Richard E. Nolan, Alfred E. Schretter, J. Anthony Kline and Davis, Polk, Wardwell, Sunderland & Kiendl for Defendant and Appellant.

Herron & Winn, John Wynne Herron and Dennis B. Conklin for Plaintiff and Respondent.

Paul D. Rheingold and Speiser, Shumate, Geoghan & Krause, as Amici Curiae for Plaintiff and Respondent.

SALSMAN, J. — Appellant Richardson-Merrell Inc.[1] appeals from a judgment on a jury's verdict awarding respondent Toole $175,000 general damages and $500,000 punitive damages for injuries suffered as a result of the use of a drug manufactured and marketed by appellant and prescribed for respondent's use by his physician. The trial court granted

---

[1] The Wm. S. Merrell Co., Inc. and Richardson-Merrell Inc. were separately named as defendants in the trial proceedings, but Wm. S. Merrell Co., Inc. has been merged into Richardson-Merrell Inc. Only Richardson-Merrell Inc. appeals.

appellant's motion for a new trial solely on the issue of punitive damages, unless respondent consented to remission of $250,000 of the punitive damage award. Respondent consented to the remission, and a new trial was denied. On appeal, appellant challenges both aspects of the judgment.

Respondent, 43 years of age, developed cataracts in both eyes as a result of taking the drug triparanol, manufactured and sold by appellant under the trade name of "MER/29". Acting under his doctor's direction, he began use of MER/29 in July 1960. He developed a condition known as ichthyosis, characterized by dry, flaky, red and inflamed skin. He also suffered hair loss over his entire body. He stopped use of the drug in December 1961. His skin returned to normal, most of his hair regrew, but cataracts developed, his eyes became opaque, and it was necessary to operate and remove the lenses of both eyes. His sight is now distorted, peripheral vision is reduced, his eyes have lost their ability to adjust for distances, are painfully sensitive to light, and he is required to wear corrective glasses. There was also evidence that he is now more apt to suffer detached retinas which could lead to blindness. He has an emotional overlay of fear that the drug may have some long-term ill effect that may manifest itself later in life.

MER/29 was supposed to aid in the treatment of arteriosclerosis, commonly described as a "hardening of the arteries." This condition is thought by some physicians to be caused, in part at least, by the presence of too much cholesterol in the blood, and to be a contributing factor in cases of heart attack and stroke. The purpose of MER/29 was to inhibit cholesterol production in the body and thus aid in the prevention of illness and death from heart attacks and strokes. But there was also evidence that, where MER/29 did inhibit the production of cholesterol, it caused an unnatural accumulation of desmosterol, which formed deposits in the arteries just as cholesterol did. Because of this, MER/29 was not considered by some physicians as a rational approach to the treatment of arteriosclerosis.

### Appellant's Administrative Organization

Before relating the evidence concerning the development and promotion of MER/29 and appellant's knowledge of its toxic effects, it is important to understand appellant's administrative organization and the responsibilities of its officers and agents in the development, testing and marketing of the drug.

MER/29 was developed by the Wm. S. Merrell Co., Inc., a division of appellant Richardson-Merrell Inc. Frank N. Getman was president of the division; Robert Woodward was executive vice president (succeeded later by E. R. Beckwith, Jr.) ; Dr. Harold Werner was vice president and director of research; Phillip Ritter was vice president in charge of marketing, and Dr. Joseph Murray was liaison officer to the Food and Drug Administration,[2] working under Vice President Werner. Below this level of management were two divisions. One, the Medical Science Division, was headed by Dr. Pogge, assisted by Drs. Bunde and McMaster, the latter in charge of medical research on MER/29. The other division was the Biological Science Division, in charge of Dr. Van Maanen. This division had five departments, one of which was the Toxicology Department headed first by Knox Smith and later by William King. Mrs. Beulah Jordan also worked in the Toxicology Department, and under the direction of Mr. King and Dr. Van Maanen compiled some of the records hereafter mentioned.

### The Evidence

Appellant's Toxicology Department began animal testing of MER/29 in 1957. In the first six-week test, all female rats on a high dosage died. All were found to have suffered abnormal blood changes. There was evidence that unusual blood changes in animals tested with drugs are regarded as a major danger signal.

A second rat study was begun, using a reduced dosage of MER/29. This test also produced abnormal blood changes in the rats. Vice President Werner was informed of these results.

In 1958 William King was hired by appellant and put in charge of the Toxicology Department, replacing Knox Smith. He was assigned to review the blood findings reported in the rat tests conducted by Smith.

In March 1959 a test of MER/29 in monkeys was completed. Again, abnormal blood changes were found. But Dr. Van Maanen ordered Mrs. Beulah Jordan, the laboratory technician, to falsify a chart of this test by recording false body weights for the monkeys, by extending their records beyond dates after which the monkeys had been killed, and by adding data for an imaginary monkey that had never been in the test group at all. Mrs. Jordan protested to King but was told:

---

[2]Hereafter referred to simply as the FDA.

"He (Van Maanen) is higher up. You do as he tells you and be quiet."

Knox Smith had prepared a brochure reflecting Merrell's test results of MER/29 on rats. This literature was intended for use of medical doctors clinically testing the drug on human beings. King revised this brochure, and eliminated all reference in it to the abnormal blood findings previously recited. Dr. McMaster, of the Medical Science Division, who was in charge of medical research on MER/29, had knowledge of the deletions, and consented to them.

On July 21, 1959 appellant filed a new drug application with the FDA seeking permission to place MER/29 on the market. The application contained many false statements, among them these:

(1) It was reported that only four out of eight rats had died during a certain study, whereas in truth all had died.

(2) Wholly fictitious body and organ weights and also blood tests were reported for dead rats as if they had continued to live and to take MER/29.

(3) None of the abnormal blood changes encountered in experiments was disclosed.

(4) False data was related for a monkey being tested with the drug, and also data was stated for a monkey that was never part of the test group.

(5) The falsified chart, prepared by Mrs. Jordan under protest was included in the application.

At the time appellant filed its new drug application it knew that MER/29 would require long-term use, because when use was discontinued cholesterol levels rose, but appellant had no data on the long-term effects of MER/29 in humans. At the time of its new drug application only 116 persons had taken MER/29 on an experimental basis, and none had used the drug for more than six months. There was evidence that before a drug such as MER/29 is marketed initial studies should be made to establish its toxicity, followed by a three-year test in humans, to be followed by a final period of testing in humans before placing the drug on the market.

The FDA informed appellant that its new drug application was incomplete; that a low margin of safety was indicated and that a two-year study in rats and a three-month study in dogs should be undertaken. This information was conveyed to President Getman and the vice-presidents and division heads under him. Dr. Murray, appellant's liaison officer, replied to the FDA and specifically informed it that there had been no

blood changes in appellant's tests of MER/29 on rats or monkeys, and that a 16-month study in monkeys had adequately demonstrated the safety of MER/29. These statements concerning absence of blood changes in animals were of course untrue.

While appellant's new drug application was pending, it arranged a conference, held at Princeton, New Jersey, to which research doctors were invited to discuss MER/29. King read a paper to the group entitled ''The Toxicology of MER/29.'' No mention was made by him of the abnormal blood changes discovered in test animals, but the false statements previously noted about weights and dosages of MER/29 given to monkeys were recited. President Getman had knowledge of this meeting and later referred to it as ''. . . the most terrific selling tool that Merrell has ever had.''

In January 1960 appellant completed another study on the effect of MER/29 in rats. Nine out of 10 rats in this study developed eye opacities. Appellant's report to the FDA of the results of this study was false or misleading because it reported that 8 out of 20 rats had developed mild inflammation of the eye, but did not disclose the eye opacities seen in the test animals.

In February 1960 appellant reported to the FDA the results of its tests of MER/29 in dogs. One dog in the test group developed eye opacities and blindness, but again this information was eliminated from the report to the FDA. In the same month, appellant completed a long term test of the drug used in rats. Of 36 test rats in this group, 25 developed eye opacities. The results of this test were also withheld from the FDA.

In April 1960 the FDA granted appellant's application to market MER/29. There was testimony at trial, however, that placing the drug on the market at that time was not in line with the general practice of reputable drug firms, in view of appellant's knowledge of the results of its animal studies and clinical investigations.

MER/29 was introduced to the market by the greatest promotional and advertising effort ever made by appellant in support of a product. There was testimony that doctors had never before seen so much promotion of a single drug. Doctors were bombarded with sales promotion, and subjected to brainwashing sessions with detailmen (salesmen). One advertising brochure stated that MER/29 was ''. . . virtually nontoxic and remarkably free from side effects even on prolonged clinical use.''

Two months after MER/29 was placed on the market, appellant received a letter from Dr. Loretta Fox, of Florida, who said she had used MER/29 experimentally on rats, and had thereafter observed lenticular and corneal eye opacities in her subjects. Dr. Fox gave the same information to the FDA, who in turn asked appellant to review her experiment and to comment on it. Dr. Murray replied to the FDA inquiry. He enclosed a memorandum from King, head of appellant's Toxicology Department, which stated that MER/29 had been used on thousands of rats, and "In only one group of animals, in one experiment, and at only one time, did we observe eye changes." King's memorandum also stated "We have no evidence from our experience or from the literature that MER/29 would in itself, produce such changes." These statements were essentially false.

On October 10, 1960, Dr. Murray again wrote to the FDA enclosing a copy of his letter of September 29th to Dr. Fox. He asserted that Dr. Fox's observations were ". . . most surprising to us" and that ". . . our pathologist states that he has never seen such involvement of the lens. . . ." At the time this letter was written, King, appellant's pathologist, had proceeded with the chronic study of MER/29 in rats, and had found an even greater percentage of rats on the lower dosage blind than when Dr. Murray's earlier letter had been sent to the FDA. All of the rats on the higher dosage of MER/29 were blind by October 1960. There was expert testimony at trial to the effect that, with all this information in hand, appellant should have withdrawn the drug from the market.

In October 1960, the "Medical Letter", a reputable medical publication, commented on MER/29. It declared: "There is no proof, however, that the drug influences the pathologic basis or the clinical course of atherosclerosis of the coronary or other arteries . . . 'Medical Letter' consultants believe that the drug should still be reserved for experimental trial . . . to repeat—it has not been shown that the reduction of blood cholesterol levels serves any therapeutic purpose." This article came to the attention of President Getman and the vice presidents and division heads serving under him.

In January 1961 appellant received a report from one of its salesmen that a doctor upon whom he had called had a patient who complained of a film over his eyes after use of MER/29. In January, also, Merck, Sharp & Dohme, a drug company, advised appellant that it had completed a long-term test of triparanol (MER/29) in rats and dogs, and had observed cata-

racts in the eyes of test animals. Neither of these events was reported to the FDA, but King went to Merck's laboratories, looked at their animals, and later reported to his superiors, including Vice President Werner, that the eye lesions he had observed in Merck's animals were very serious. He stated that a similar study on dogs should be begun in appellant's laboratories.

Appellant's advertising and promotional material in behalf of MER/29 continued unabated. Vice President Ritter, in charge of marketing, discussed his promotional plans and proposed advertising campaigns with President Getman who had the power of final decision. Appellant's drug salesmen were told that MER/29 was a ". . . proven drug . . . There is no longer any valid question as to its safety or lack of significant side effects."

In February 1961 a doctor in Los Angeles advised appellant by telephone that he had a patient who had been using MER/29 and had developed cataracts. In that same month, appellant's medical librarian was asked to collect all available information on the incidence of cataracts in normal adults over the age of 35 and forward the material to Vice President Werner.

In March 1961 Vice President Woodward disclosed that appellant had received 51 reports of thinning hair from persons using MER/29 and that he felt obliged to convey this information to the FDA and to do so promptly to protect the company from possible damage suits. This information was conveyed to President Getman and other high officers of appellant.

In April 1961 appellant began a long-term study of MER/29 in rats and dogs. By June opacities had begun to develop in the eyes of the rats, and by August, 35 out of 46 rats in the experiment had developed eye opacities. Despite these findings, and a field report that a doctor using MER/29 had suffered a change of eyesight, promotion of the drug continued unabated. Appellant gave no report to the FDA or warning to the medical profession in general concerning these developments.

In September 1961 Robert S. Shelton, a retired vice president of the company, advised President Getman that some recent articles containing unfavorable comment on MER/29 were not being sent to Vice President Ritter for fear they would discourage his efforts in promoting sale of the drug.

In October 1961 a report was received by appellant from

the Mayo Clinic of two patients who, after use of MER/29, had developed cataracts, suffered hair loss and skin irritation. By this time also medical literature had begun to appear, casting MER/29 in an unfavorable light. An article in Mc-Call's magazine, written by Dr. Fishbein had been particularly critical. But appellant's vice president in charge of sales promotion advised its salesmen: "I suggest twisting this query into a positive sales aid when brought up—rather than agreeing with Dr. Fishbein's negativism."

In mid-October 1961 5 of the 7 dogs in the test of MER/29 begun by appellant in April had developed eye opacities. Dr. Murray telephoned the FDA and read a proposed reassurance letter which appellant wished to send to the medical profession describing known side effects of skin trouble, falling hair and cataracts, but advising doctors that they could continue use of the drug. The FDA replied in writing, noting that appellant had stressed freedom from side effects in its advertising and promotional literature, and demanding that appellant furnish "all data concerning adverse and toxic reactions resulting from MER/29 therapy in both animals and humans." Dr. Murray replied, sending reports and materials, but significantly did not reveal the results of appellant's animal tests begun in April, in which all of the female rats tested with the drug had developed eye opacities, and 20 out of 24 male rats had become blind. One report enclosed concerned appellant's long-term test on dogs, and reported that the eyes of all dogs but one were normal. In fact, of the 7 dogs that survived the tests, 5 had striations (opaque bands) in the lens of the eyes that indicated developing cataracts.

In November 1961 a conference was held in Washington, D.C. between appellant's officers and officials of the FDA. President Getman attended. FDA officials stated their belief that MER/29 should be withdrawn from the market. President Getman professed shock. Vice President Woodward declared that MER/29 was ". . . the biggest and most important drug in Merrell history. . . ." and vowed to defend it at every step. At this meeting also a profound difference of opinion arose concerning appellant's legal duties under the Pure Food, Drug and Cosmetic Act. FDA officials took the position that appellant was required to submit all data concerning side effects and toxicity of their product and that this should be done when the information was first received. Appellant, on the other hand, maintained that it could submit such data as it wished,

using its own judgment. Later, in an inter-company memorandum, Vice President Woodward, who had argued appellant's position with the FDA in Washington, declared that the company was in effect being accused of withholding data, and noted that ". . . the full body of company knowledge did not accompany our recent supplemental application."

In early November 1961 appellant directed its salesmen to turn in all MER/29 samples. The FDA telephoned and asked appellant voluntarily to withdraw the drug from the market. President Getman and the various vice presidents and division heads were aware of these events. Getman and other company officers again went to Washington to meet with FDA officials. At this meeting, in response to appellant's pleas, the FDA agreed to allow MER/29 to remain on the market, but only on condition that a drastic warning letter be issued to the medical profession.

On December 1, 1961, appellant issued the warning demanded. It advised the medical profession of known cases of cataracts from use of MER/29. After issuance of this warning letter, the British government requested appellant to withdraw the drug from the British market. Appellant refused, and stated its determination to others to maintain the sales promotion of MER/29 in Britain.

In March 1962 appellant received a report from the Mayo Clinic of a six and one-half-year-old boy who had cataracts following use of MER/29.

In April 1962 FDA officials made an unannounced visit to appellant's laboratories and took all of appellant's records relating to its animal experiments. After the records were seized, President Getman drafted a letter to the FDA requesting withdrawal of MER/29 from the market, and on May 22, 1962 the agency issued its order suspending permission for the marketing of the drug on the ground that it was unsafe for its intended use.

MER/29 was administered to approximately 400,000 persons during its relatively short market life. In its first year at large it contributed ,$7,000,000 to appellant's gross sales. Four hundred and ninety cases of cataracts caused by use of the drug were reported. The majority of those on the drug maintained its use for less than three months. There was evidence that a very high percentage of those taking the drug would have developed cataracts if the drug had remained on the market and they had continued its use.

Respondent's complaint alleged causes of action based upon theories of negligence, breach of express warranty and breach of implied warranty, and demanded both compensatory and punitive damages. As we have seen, the jury returned its verdict in respondent's behalf, awarding compensatory and punitive damages. Since the verdict was a general one, and no special interrogatories were requested by either party, we cannot know from the record which of respondent's various theories of liability the jury chose as the basis for its award. But if the verdict finds support in the record on any theory upon which the case was tried, and the record is otherwise free of reversible error, we must affirm the judgment.

Appellant attacks both the award of compensatory damages and the award of punitive damages, and assigns numerous claims of error against each award. We first discuss the judgment for compensatory damages.

I

ERRORS CLAIMED TO AFFECT THE JUDGMENT FOR
COMPENSATORY DAMAGES

1. *No Question Is Raised Concerning Sufficiency of the Evidence to Support the Award of Compensatory Damages.*

Appellant does not directly challenge the sufficiency of the evidence to support the compensatory damage award. It is clear from those portions of the record we have heretofore recited that the jury could infer that appellant did not exercise ordinary care adequately to test MER/29 before placing it on the market, and did not give adequate warning to the medical profession, and through it to respondent, of known dangerous side effects of the drug. Thus the award of compensatory damages may readily be sustained on the ground of negligence, unless some or all of the claimed errors relating to this portion of the judgment were prejudicial to appellant's defense and amount to reversible error.

2. *There Was No Error in the Court's Instruction on the Effect of the Violation of a Statute.*

Section 355(b) of the Federal Food, Drug, and Cosmetic Act requires an applicant to submit ". . . full reports of investigations which have been made to show whether or not such drug is safe for use; . . ." As we have related in the statement of facts, reports submitted to the FDA by appellant in support of its application were in some respects false, and in other respects entirely failed to reveal the cataractogenic character of its drug as shown by its effect on rats and

dogs. The trial court instructed the jury that if a party to this action violated section 355(b) ". . . a presumption arises that he was negligent," and at the same time called the jury's attention to the fact that the presumption, if found applicable, was not conclusive but could be overcome by a showing that, under all the circumstances, the violation was excusable or justifiable. (See *Alarid* v. *Vanier*, 50 Cal.2d 617, 621 [327 P.2d 897], and cases cited.)

Appellant contends the court's instruction was error in that no private cause of action arises because of a violation of section 355(b). (See *United States* v. *Gilliland*, 312 U.S. 86, 93 [85 L.Ed. 598, 603, 61 S.Ct. 518].) In support of this contention appellant cites a 1933 proposal to include in the Federal Food, Drug, and Cosmetic Act a provision for a private right of action for damages for injury or death caused by violation of the act, and notes that this proposal was never adopted by the Congress. Appellant views this as a demonstration of congressional intent that no such private right of action exsts. Respondent, however, did not attempt to state a cause of action for damages for breach of the federal statute. He stated a cause of action based upon alleged negligent conduct on the part of appellant which negligent conduct he asserted was the proximate cause of his injuries. In support of this cause of action, as well as others stated, he introduced a great deal of evidence by which he hoped to convince the jury that appellant had falsely stated the results of its tests of MER/29 on rats and dogs and hence had violated section 355(b). This was done, not to support a cause of action based upon the statute, but for the purpose of showing that appellant had violated statutory standards, thus raising a presumption of negligence on its part because of such conduct. This was entirely proper.

Such a statute may, however, and does here, establish a standard of conduct, and violation of that standard may, and does here, give rise to a presumption of negligence. In *Clinkscales* v. *Carver*, 22 Cal.2d 72, 75 [136 P.2d 777], our Supreme Court declared that: "The significance of the statute in a civil suit for negligence lies in its formulation of a standard of conduct that the court adopts in the determination of such liability. (See Holmes, The Common Law, 120-129; Morris, *The Relation of Criminal Statutes to Tort Liability*, 46 Harv. L. Rev. 453.)"

Appellant concedes that violation of the *labelling and marketing* provisions of the act may be shown to establish

negligence, but argues there is a difference between violation of the labelling and marketing provisions and violation of the *reporting provisions,* because the labelling provisions of the statute are designed to protect the public, whereas the reporting provisions are concerned merely with raw data comprehensible only to scientists in the FDA. We find this argument unconvincing. The act is designed to protect the public as a whole (*United States* v. *Sullivan,* 332 U.S. 689, 696 [92 L.Ed. 297, 303, 68 S.Ct. 331]) and to keep dangerous and deleterious products from reaching the uninformed consumer. We see no logical distinction between the labelling provisions of the act on the one hand and the reporting provisions on the other, with respect to the class of persons to be protected or the harm to be prevented. Permission to market a drug depends in part at least upon an evaluation of test data submitted by an applicant. The submission of false and misleading reports of tests can only subvert the administrative decision, defeat the purposes of the act, and make the legend on the label a useless guide so far as protection of the public is concerned.

3. *Full Reports of Appellant's Investigations Were Required by the Food, Drug and Cosmetic Act. The Administrative Regulations Did Not Diminish the Statute's Requirements.*

█ Appellant offered an instruction which concluded: ". . . the defendant does not violate the Federal Food, Drug and Cosmetic Act merely because all reports, however inconsequential, have not been submitted to the Food and Drug Administration, but only if full reports of all *adequate* tests were not submitted." (Italics ours.) As we have seen, section 355(b) of the act requires submission of "(1) full reports of investigations which have been made to show whether or not such drug is safe for use. . . ." Appellant argues that FDA regulations, and the form upon which a new drug application must be made provide that "An application may be incomplete or may be refused unless it includes full reports of *adequate tests* by all methods *reasonably applicable* to show whether or not the drug is safe for use as suggested in the proposed labeling." (Italics ours.) This language, it is contended, defines the extent of appellant's obligation to report test data to the FDA.

Appellant's proposed instruction was properly refused. The statute requires submission of "full reports" before a new drug application is considered. If the regulation, requiring

submission of "full reports of adequate tests" be deemed to diminish the requirements of the statute, the regulation would, to that extent, be void. (See *United States* v. *Grimaud,* 220 U.S. 506 [55 L.Ed. 563, 31 S.Ct. 480].) Moreover, to accept appellant's view as embodied in its proposed instruction would necessarily mean that an applicant for permission to market a new drug need only submit such test data as *it* deemed adequate. Thus an applicant might readily choose only such test results as favor its application, determine that such tests were adequate, and submit only favorable data in support of its application. This view of the act's requirements would quickly destroy its protective features. We think the purpose of section 355(b)(1) is to require submission of all relevant data bearing upon the safety of the drug proposed to be marketed, and that the question of the adequacy of such tests and of the data submitted is strictly for the determination of the administrative agency. It necessarily follows that the trial court was correct in instructing the jury in the terms of the statute, and there was no error in rejecting appellant's instruction based upon the agency's regulation.

4. *There was no Error in Refusing Appellant's Instruction on Proximate Cause.*

 Appellant submitted two instructions on proximate cause. The trial judge declined to give either. In effect, each instruction would have told the jury that, even if appellant failed to submit full reports of its tests, in violation of the requirement of the Federal Food, Drug, and Cosmetic Act, before liability could be fastened upon appellant it must appear that its violation of the statute was a proximate cause of respondent's injuries. These instructions contained error. They were properly refused. They did not allow for the possibility of proof of negligence by other means, as for example, by proof that after appellant knew of the toxic effect of its drug it continued to press its sale, without warning of its possible dangers. (See *Sinan* v. *Atchison etc. Ry. Co.,* 103 Cal.App. 703, 714-717 [284 P. 1041].) Moreover, the jury was fully instructed on all aspects of proximate cause. They were given the accepted definition of proximate cause substantially in the language of BAJI 104, and were further told that the plaintiff had the burden of proving both negligence and proximate cause. We think the subject was adequately covered by the instructions given, and that rejection of appellant's instructions was not error.

**5.** *There Was No Error in the Court's Refusal to Grant a Directed Verdict on Issues of Fraud and Express Warranty.*

 Appellant next argues that a verdict should have been directed in its behalf on respondent's causes of action for fraud and breach of express warranty. Appellant says first that the statements it made about MER/29 were mere expressions of scientific opinion made to physicians, and second that there is no evidence that respondent relied upon any of the statements made by appellant. The jury's verdict, however, necessarily contains implied findings that appellant's statements were misrepresentations of material facts and that respondent relied upon them to his injury and damage. These findings are supported by the record.

Appellant represented that: (a) MER/29 is virtually nontoxic; (b) it is remarkably free from side effects; (c) it is a proven drug; (d) it has been administered under controlled conditions to more than 2,000 patients for periods up to three years; (e) there is no longer any valid question as to its safety or lack of significant side effects; (f) MER/29 has a unique, specific and completely safe action.

 It is true, as appellant contends, that in an action for fraud and deceit based upon alleged misrepresentations of the defendant, the misrepresentations relied upon must be of fact and not opinion. (*Haserot* v. *Keller,* 67 Cal.App. 659, 670-671 [228 P. 383].) The same rule is applicable in actions for breach of express warranty—the representation must be of fact and not opinion. But this rule has well-recognized exceptions. Where the party making the representations has superior knowledge regarding the subject matter of his representations, and the other party is so situated that he may reasonably rely on such supposed superior knowledge or special information, the representations may be construed as fact and not opinion. (*Haserot* v. *Keller, supra,* 67 Cal.App. 659, 670; see also Rest., Torts, § 542.)

 Our record is replete with evidence showing that the statements recited were widely made to the medical profession generally, were orally made by appellant's detailmen in soliciting use of the drug by the profession, and were made by means of advertisements in medical journals and periodicals, and also by written material supplied generally to doctors. There is no doubt concerning appellant's superior knowledge of the effect of its drug. It had conducted many experiments and had observed its effect in rats, dogs and monkeys. It had seen the blood changes in all of its experimental animals and

knew of the eye changes suffered by many if not most of the animals. This was knowledge possessed only by appellant, not by this respondent, the medical profession or the FDA. Moreover, appellant's statements were not qualified as mere technical opinions but were positively asserted in a manner fully justifying the conclusion that they were statements of fact and not opinion. The fact, which appellant stresses, that the label contained a warning that ". . . the long-term or lifetime effects [of the drug] are unknown" offers appellant little comfort. The jury was not bound to find that the warning on the label cancelled out all the other representations made by it concerning the drug.

Appellant next says there is no evidence to show that respondent relied upon any of its representations. But there was evidence from which the jury could readily infer reliance on the representations. Respondent's doctor, his agent, relied upon them. The doctor stated in his deposition that in prescribing the drug he relied upon the literature supplied by appellant and that he talked to appellant's salesmen on many occasions about the drug. The statements concerning safety of the drug and its lack of side effects were included in the literature, and the salesmen had been instructed to stress such factors when talking to doctors. The jury could infer that appellant's representations were read and heard by respondent's doctor and that he relied upon them in prescribing the drug for respondent's use. These are reasonable inferences to be drawn from the proven facts. Of course appellant argues it is equally probable that the doctor relied upon other material, such as scientific articles written by other doctors or upon other and accurate parts of the extensive literature on the drug. But on appeal we must presume that the jury drew inferences that support the general verdict, and did not indulge in those that would tend to defeat it. (*Hamilton* v. *Pacific Elec. Ry. Co.*, 12 Cal.2d 598, 603 [86 P.2d 829]; see also *Love* v. *Wolf*, 226 Cal.App.2d 378, 401 [38 Cal.Rptr. 183].)

Appellant further argues that respondent's doctor did not testify to any specific statements relied upon by him, or identify or discuss any specific advertising or promotional material issued by appellant and relied upon by him. This, of course, is true. Respondent's doctor died before trial. The only testimony from him was that contained in his pretrial deposition. But in his deposition he made clear that he had talked with appellant's salesmen more than once about

MER/29 and that its promotional literature had come to his attention. A reasonable inference from this evidence is that appellant's representations as to MER/29's nontoxic effect and freedom from side effects came to the attention of respondent's doctor through statements of its salesmen and the literature it presented and that the doctor relied upon such representations in prescribing the drug for respondent.

When all of the evidence relating to fraud and breach of express warranty is considered, it is clear that the granting of a motion for a directed verdict on these issues would have been error. A directed verdict may be granted " ' . . . only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, . . . indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " (*Estate of Lances*, 216 Cal. 397, 400 [14 P.2d 768] ; *Estate of Flood*, 217 Cal. 763, 769 [21 P.2d 579] ; see also 2 Witkin, Cal. Procedure (1954) Trial, § 125, pp. 1857-1858.) Our record reflects a conflict in the evidence on issues of warranty and fraud. Different inferences might be drawn from the evidence. Our rule is crystal clear that, where such is the state of the evidence, a directed verdict may not properly be granted.

6. *Implied Warranty May Be Found in Sale of Prescription Drugs.*

The court instructed the jury on the subject of implied warranty. The jury was told that, for respondent to succeed on the issue of implied warranty, it must find that he purchased MER/29 as recommended by his physician; that the drug was capable of causing harmful side effects when taken as recommended, and that plaintiff's injuries were, with reasonable probability, caused by use of the drug.

Appellant contends this instruction is error because no warranty may be implied and no doctrine of strict liability is applicable to sale of unadulterated and uncontaminated prescription drugs. Appellant cites comment (k) to section 402-A of the Restatement Second of Torts. Comment (k) discusses sale of products which, in the present state of human knowledge, are incapable of being made safe for their intended use. It concludes that such products ". . . *properly prepared, and accompanied by proper directions and warning*" are not defective or unreasonably dangerous, and that the seller of such

products ". . . again with the qualification that they are *properly prepared and marketed and proper warning is given"* is not to be held to strict liability for unfortunate consequences attending their use. (Italics ours.) Appellant cites *Cochran* v. *Brooke,* 243 Ore. 89 [409 P.2d 904] (Supreme Court of Oregon, January 19, 1966) ; *Cornish* v. *Sterling Drug, Inc.,* CCH Products Liability Reports, Par. 5415 (W.D. Mo. 1965) ; *Love* v. *Wolf, supra,* 226 Cal.App.2d 378 ; *Magee* v. *Wyeth Laboratories, Inc.,* 214 Cal.App.2d 340 [29 Cal.Rptr. 322], and *Kaspirowitz* v. *Schering Corp.* (1961) 70 N.J. Super. 397 [175 A.2d 658], as cases in accord with the view of the Restatement.

The case before us, however, is distinguishable in some respects from the cases cited. Our case falls within the qualification expressly noted in comment (k) of the Restatement and which we have emphasized above. Here the evidence is clear that appellant did not disclose the full extent of its knowledge in filing and supporting its new drug application. Appellant did not reveal the significant blood changes in the test animals it dosed with the drug it proposed to market. It did not disclose the grave eye changes found in its test animals. There was evidence that medical opinion holds such matters to be of great importance in evaluating the toxic effect of drugs. In light of the nondisclosure of significant facts which, if known to the FDA, would have enabled its scientists to make a more critical analysis of MER/29, it can hardly be said that the FDA's permission to market the drug was an informed judgment, based on all the known facts, or that it was uninfluenced by appellant's nondisclosure. Moreover, Dr. Schlichtmann testified that he would not have prescribed MER/29 if he had known of the false reports of appellant's test results, because danger from use of the drug would have been greater than any benefit the patient might receive. In short, we cannot say that appellant's drug was "properly prepared and marketed" so as to bring it within the exception described in comment (k) of the Restatement, exempting the seller from strict liability.

There is another reason why the principles expressed in comment (k) to section 402-A of the Restatement do not aid appellant here. There was evidence that its drug was not properly labeled in that it did not give adequate warning of its inherent dangers. Appellant had knowledge, before permission to market its new drug was granted, that use of the drug in test animals caused blood changes and eye opacities.

When permission to market the drug was first given, nothing was said in the labeling information about the possibility of eye opacities from its use. It is true the label warned that "longterm or lifetime" effects of the drug were unknown, but this is a far cry from an affirmative warning of the possibility of eye changes caused by use of the drug. It is also true that, when evidence of eye changes began to accumulate, appellant amended its labeling information to warn of the possibility of thinning hair and skin trouble as possible side effects; but appellant said nothing about eye opacities or cataracts until a year and a half after the drug was first brought to market. Long before this warning was given, independent research, such as that conducted by Dr. Fox and Merck, Sharp & Dohme, had disclosed the alarming toxicity of MER/29, and appellant had also received field reports of eye trouble from use of its product. There was an abundance of evidence before the jury from which it could reasonably infer that in marketing MER/29 proper warning had not been given of the known consequences of its use. That the jury drew such an inference from the evidence is implicit in its verdict.

We realize that there is language in *Love* v. *Wolf, supra,* 226 Cal.App.2d 378 that may seem contrary to our holding here. In reversing the judgment of the trial court, the appellate court there said: "The evidence discussed above is, we have held, sufficient to present a triable issue on the negligence of Parke-Davis. The question is raised (and may be raised again when the cause is retried) as to whether the evidence justifies the finding of an implied warranty." Later in its opinion the court also declared: "No rule of *strict* liability (whether expressed in terms of breach of an implied warranty, or in terms of a breach of a duty of care in tort) has been applied to a failure adequately to warn of the dangers inherent in the use of a drug." Nevertheless it appears to us that *Love* clearly recognized the possibility that the vendor of prescription drugs may become liable on a theory of implied warranty if the facts justify the application of such rules.

■ Whether or not the vendor of a prescription drug is to be exempt from strict liability depends upon the facts surrounding the manufacture and sale of the product. If the vendor has properly prepared the product and has accompanied its sale with proper directions and warnings, he will not be held to strict liability for unforeseen results. But where the facts disclose that the drug has not been properly pre-

pared or has been placed upon the market and sold without adequate and proper warning, strict liability for resulting injury may be found.

The decision in *Gottsdanker* v. *Cutter Laboratories,* 182 Cal.App.2d 602 [6 Cal.Rptr. 320, 79 A.L.R.2d 290] is in accord with these principles. There, the vendor manufactured a polio vaccine. The product was defective in that it contained live polio virus, capable of causing, and which did cause, poliomyelitis. Strict liability was imposed upon the vendor because the product had not been properly manufactured, thereby causing the very illness it was supposed to prevent. In our case, while the product did not cause the illness it was designed to prevent, namely heart attack and stroke, it did cause grave injury to the eyes. The possibility of eye injury and damage was known to appellant before the product was placed on the market and yet no warning of this danger was given until the weight of accumulating evidence and the insistence of the FDA compelled it. Thus strict liability is justified on the ground that the product was marketed without proper warning of its known dangerous effect.

II

ALLEGED ERRORS CLAIMED TO AFFECT THE AWARD OF
PUNITIVE DAMAGES.

1. *Substantial Evidence Supports the Jury's Implied Finding that Responsible Management of Appellant Corporation Participated in the Wrongful Acts Which Are the Foundation of the Punitive Damage Award.*

Appellant contends that as a matter of law a verdict should have been directed for it on the issue of punitive damages. It argues that if wrongful acts were done by its agents it must be shown that such acts were authorized or ratified by responsible management in order to hold the corporation liable.

A corporation may be held liable for punitive damages for the acts of its agents and employees when the act is done in ill will, or is motivated by actual malice, or done under circumstances amounting to fraud or oppression, providing that the act is done with the knowledge or under the direction of corporate officials having power to bind the corporation. (*Lowe* v. *Yolo County etc. Water Co.,* 157 Cal. 503 [108 P. 297].)

Appellant argues that none of the wrongdoing upon which respondent relies to show fraud was known to any officer or principal having power to bind the corporation; that

all of the alleged wrongful acts were done by agents and employees below the level of responsible management and hence, under the rule described in such cases as *McInerney* v. *United Railroads of San Francisco*, 50 Cal.App. 538, 549 [195 P. 958] and *Alterauge* v. *Los Angeles Turf Club*, 97 Cal.App. 2d 735 [218 P.2d 802], the corporation cannot be held liable for punitive damages. This argument cannot succeed here because its validity depends upon facts favorable to its application, and facts in our record do not support it. There was ample evidence from which the jury could infer that high level management had knowledge of wrongdoing on the part of department heads and other employees and agents. As we have related in a statement of the evidence, Dr. Van Maanen was appellant's associate director of research, in charge of the Biological Science Division. There were five departments directly under him. One of these was the Toxicology Department, in charge of William King. Dr. Van Maanen directed falsification of the test results, as we have previously related. Falsification of these results permitted appellant to conceal the toxicity of MER/29 and tended to deceive the FDA into allowing appellant to market a potentially injurious drug. Dr. Van Maanen was high enough on the executive scale of responsibility to hold appellant liable in punitive damages for his wrongful acts. Further, there was the evidence of the doctors' conference at Princeton, New Jersey, where Mr. King read a report on the toxicity of MER/29, omitting the unfavorable data on blood changes and eye changes in test animals, noted in previous tests and described in reports by his predecessor, Knox Smith. President Getman had knowledge of this meeting and knew its purpose. He later described its results in glowing terms.

Since appellant had been conducting experiments for several years with MER/29 on animals, the jury could reasonably infer that management had some knowledge of test results, especially since other evidence disclosed great company interest and enthusiasm for MER/29. Moreover, there is evidence that Vice President Woodward, who was just one step below President Getman, admitted in an inter-company memorandum that ". . . the full body of company knowledge . . ." had not accompanied appellant's supplemental application to the FDA—an admission made at a time when appellant was accused by the FDA of withholding test data.

From all of this evidence the jury could reasonably infer that corporate management, at least from the level of Vice

President Woodward on down, had knowledge of the true test results of MER/29 when used in animals, and that some or all had joined in a policy of nondisclosure of vital information. Thus corporate responsibility for the wrongdoing of its officers and agents is fully established.

2. *Malice in Fact was Established.*

Appellant next argues that the punitive damage award cannot be sustained because malice in fact was not proven.

Civil Code section 3294 allows punitive damages where the defendant has been guilty of ". . . oppression, fraud, or malice, . . ." The trial court gave no instructions on the circumstances under which such damages could be awarded for oppression or fraud but limited its instructions on punitive damages to the subject of malice. At appellant's request, the court instructed the jury that "Malice . . . implies an act conceived in a spirit of mischief or with criminal indifference toward the obligations owed to others. There must be an intent to vex, annoy and injure. Defendant's conduct must have been so recklessly disregardful of the rights of others, so as to be characterized as wanton or wilful conduct. Mere negligence, even gross negligence, is not sufficient to justify such an award."

There is no doubt that where malice is the ground relied upon to support an award of punitive damages, malice in fact must be established by the evidence. (*Davis* v. *Hearst,* 160 Cal. 143 [116 P. 530]; *Roth* v. *Shell Oil Co.,* 185 Cal.App. 2d 676, 682 [8 Cal.Rptr. 514]; *Gombos* v. *Ashe,* 158 Cal.App. 2d 517, 527 [322 P.2d 933]; see also *Read* v. *Turner,* 239 Cal.App.2d 504, 515 [48 Cal.Rptr. 919].) Appellant says there is no showing of any deliberate intent to do harm to respondent, and that in the absence of a showing of deliberate intention on the part of appellant to injure respondent the award of punitive damages must fall. But malice in fact, sufficient to support an award of punitive damages on the basis of malice as that term is used in Civil Code section 3294, may be established by a showing that the defendant's wrongful conduct was wilful, intentional, and done in reckless disregard of its possible results. Where, as here, there is evidence that the conduct in question is taken recklessly and without regard to its injurious consequences, the jury may find malice in fact. (*Davis* v. *Hearst, supra,* 160 Cal. 143, 162-163.) Such malice is consistent with a personal intent to injure those affected by the defendant's conduct. (See *Wolfsen* v. *Hatha-*

*way,* 32 Cal.2d 632, 650 [198 P.2d 1]; *Roth* v. *Shell Oil Co., supra,* 185 Cal.App.2d 676.) In *Sturges* v. *Charles L. Harney, Inc.,* 165 Cal.App.2d 306, 320 [331 P.2d 1072], the defendant graded and filled an area above plaintiff's home, stripping the vegetation and underbrush from the hillside in the process. The defendant deliberately failed and refused to comply with the city's ordinances relating to drainage where grading was done. Unusual rainfall caused a flooding of plaintiff's home because of defendant's work and its failure and refusal to establish drainage as required by the city's ordinances. An award of punitive damages was sustained because of defendant's wilful and reckless conduct showing an utter disregard of possible injury to others because of its acts.

In our case there is evidence from which the jury could conclude that appellant brought its drug to market, and maintained it on the market, in reckless disregard of the possibility that it would visit serious injury upon persons using it. Besides the falsification of test data under the direction of Dr. Van Maanen and the withholding from the FDA and the medical profession of vital information concerning blood changes and eye opacities in test animals, there was evidence that, after Dr. Fox reported eye opacities and blindness in her test animals, and after Merck, Sharp & Dohme had made a similar report, appellant continued to represent to the medical profession that MER/29 was a proven drug, remarkably free from side effects, virtually nontoxic, having a specific and completely safe action. In light of appellant's knowledge, the jury could infer that these statements were recklessly made, with wanton disregard for the safety of all who might use the drug. Moreover, similar representations continued to be made even after the first report of cataracts in a human had been received and after appellant's later tests confirmed the presence of eye opacities in virtually all test animals. When respectable medical publications began to challenge the toxicity and efficacy of MER/29, appellant's salesmen were instructed to blame side effects on other drugs, or at least to suggest that as a good possibility. Even after a number of cases of cataracts in humans from use of MER/29 had been reported to appellant, and when its own tests had established blindness in its test animals, appellant continued to defend sale of its drug. When in November 1961 Dr. Nestor of the FDA expressed the opinion that MER/29 should be withdrawn from the market he was told by Vice President Woodward, in President Getman's presence, that MER/29 ". . . was the biggest

and most important drug in Merrell history. . . ." and that the company intended ". . . to defend it at every step. . . ." and would withdraw the drug from the market voluntarily only when it determined that its inherent risk outweighed its efficacy. In December 1961 the FDA compelled appellant to issue a drastic warning letter notifying the medical profession of known cases of cataract in humans from use of the drug. Appellant nevertheless continued with plans vigorously to promote its sale.

From all of the evidence the jury could find that appellant acted recklessly and in wanton disregard of possible harm to others in marketing, promoting, selling and maintaining MER/29 on the market in view of its knowledge of the toxic effect of the drug. Such a finding would necessarily be a finding of malice in fact, and since the jury was instructed only on malice as a foundation for an award of punitive damages and made such an award in respondent's favor, we must presume they found malice in fact.[3]

### 3. *The Instructions on Burden of Proof Were Sufficient.*

Appellant complains that the trial court inadequately instructed the jury with regard to the burden of proof as to punitive damages. Appellant offered an instruction taken from the language of *Gombos* v. *Ashe, supra,* 158 Cal.App.2d 517, 526, in which the court commented that punitive damages ". . . are not a favorite of the law and the granting of them should be done with the greatest caution. They are only allowed in the clearest of cases." The court properly refused this instruction. The instruction accurately reflects the attitude of the law with respect to punitive damages, but it is not reversible error for a trial judge to decline to give it. Punitive damages were correctly described in the court's instructions.

---

[3]Our attention has been driected to the case of *Roginsky* v. *Richardson-Merrell Inc.,* decided by the United States Court of Appeals for the Second Circuit in September 1966 (rehearing denied May 8, 1967). In that case the plaintiff's injuries arose out of the same course of conduct, by the same defendant, as is described in our record. In *Roginsky,* a three-judge panel of the court concluded, one judge dissenting, that there was no evidence in its record sufficient to warrant submitting the case to the jury on the issue of punitive damages, and therefore nullified an award of punitive damages. We respectfully differ from that holding. We see in our record ample evidence of conduct on the part of appellant from which the jury could infer intentional, wilful and reckless conduct on appellant's part, done in disregard of possible injury to persons such as respondent. The evidence, a portion of which we have recited, clearly raised an issue on which respondent was entitled to a jury's determination.

The jury was told the circumstances under which such damages could be allowed. It was made clear to the jury that the plaintiff in the action had the burden of proof with regard to punitive damages and on such issues as fraud, misrepresentation and malice. Further instructions were not required.

4. *The Punitive Damage Award Does not Violate Appellant's Constitutional Rights.*

 Appellant's final argument against the punitive damage award is that it violates its rights under the Constitutions of the United States and the State of California. The judgment is described as a penal one, wherein a fine has been imposed upon appellant without benefit of the constitutional safeguards accorded those accused of crime.[4]

. Thus appellant says it was allowed only six peremptory challenges rather than the ten allowed by Penal Code section 1070; a unanimous verdict was not required; the vote of nine jurors was allowed to impose a penalty, and it was denied the presumption of innocence, a fundamental right given to all persons accused of crime. Appellant cites no case in support of its contentions, and we find none in its favor.

-- The United States Supreme Court has considered and re-

---

[4]Appellant moved for a new trial. It argued that the punitive damage award violated its constitutional rights and constituted double jeopardy. Appellant produced a portion of a record of the United States District Court for the District of Columbia. That record discloses that the Wm. S. Merrell Company, Richardson-Merrell Inc., Harold W. Werner, Evert F. Van Maanen and William King were indicted by the Grand Jury of the District of Columbia and charged with violation of 18 U.S.C. § 1001 (making false and fictitious statements to the FDA). Pleas of nolo contendere were entered by all defendants. Fines of $60,000 and $20,000 were imposed on the Wm. S. Merrell Company and Richardson-Merrell respectively. Imposition of sentence was suspended as to the individual defendants and each was placed on probation. This record was not before the jury, but was made a part of the trial record by appellant on its motion for a new trial, and is before us as a part of the appellate record. We consider this record as tantamount to an admission that appellant's reports and statements made to the FDA in support of its new drug application were not ''errors'' or mere misstatements, as suggested in appellant's briefs, but were in fact wilfully false statements within the prohibition of the statute. But we do not rely upon the federal record to show that appellant's statements to the FDA were not mere errors. The trial record clearly shows false reports intentionally made to the administrative agency.

18 U.S.C. § 1001 reads: ''Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.''

jected arguments similar to those now urged upon us. In *United States* v. *Regan*, 232 U.S. 37 [58 L.Ed. 494, 34 S.Ct. 213] a civil action to recover a penalty for the commission of. a public offense, the court stressed the civil nature of the action, and pointed out that civil rules of procedure rather than criminal rules were applicable. (See also *United States* v. *Zucker*, 161 U.S. 475 [40 L.Ed. 777, 16 S.Ct. 641].) Here respondent's action, although it demanded punitive damages as part of the relief sought, was purely civil in nature. The constitutional guarantees which appellant says it was denied are applicable in criminal cases but are not controlling in purely civil actions such as the case before us. It follows that the award of penal damages made under civil rules of procedure did not violate any constitutional right of appellant.

Appellant also argues that certain evidence, particularly portions of its advertising material, as well as reports to the FDA, was erroneously admitted, that such evidence aroused prejudice in the minds of the jurors, and denied appellant a fair trial. But the evidence mentioned was relevant to the issue of fraud which respondent claimed was practiced upon him through his agent, namely his doctor. It was material to show the intent with which such statements were made. We see no error in the admission of this evidence and find nothing in the record to support the charge that appellant was denied a fair trial.

5. *Respondent Cannot Claim Error.*

Respondent urges us to modify the trial court's judgment by relieving him of his stipulation agreeing to reduction of the punitive damage award from $500,000 to $250,000. He argues that this would be but a modification of the judgment and that the appellate court has the power to add to or increase an award of damages where they have been improperly reduced by the trial court. He also contends that the trial judge was in error as a matter of law in reducing the punitive damage award. These contentions have no merit. In the first place, respondent stipulated to reduction of the punitive damage award in order to avoid a new trial. To relieve him of this stipulation would grant him the full fruits of the judgment without further risk on his part. But equally fatal to his request is the fact that he did not appeal and hence is in no position to attack the judgment. (*Hager* v. *Hager*, 174 Cal. App.2d 546, 550 [345 P.2d 68]; 3 Witkin, Cal. Procedure (1954) Appeal, § 72, and cases cited.)

The judgment is affirmed.

Draper, P. J., and Brown (H. C.), J., concurred.

A petition for rehearing was denied on July 12, 1967, and the following opinion was then rendered:

THE COURT.—In its petition for rehearing appellant again argues that none of its officers or agents possessed sufficient authority to expose the corporation to an award of punitive damages for their misconduct. This point was fully covered in the briefs. We carefully reviewed the record on the issue, and stated the relevant facts in our opinion. We have reconsidered the point once more, and see no reason to depart from our conclusion that there is ample evidence in the record from which the jury could infer that responsible corporate officials, at least up to the level of vice-president, had knowledge of the true test results of MER/29 when used in animals, and that some, or all, joined in a policy of nondisclosure of this information to the Food and Drug Administration and the medical profession.

Appellant also re-argues the sufficiency of the evidence to establish the existence of malice in fact. In our opinion we fairly stated the evidence on this issue. In doing so we stated the facts ". . . in a manner most favorable to the plaintiff who prevailed below, as required on appellate review." (*Waller* v. *Southern Pac. Co.*, 66 Cal.2d 201, 204 [57 Cal.Rptr. 353, 424 P.2d 937]; see also *Leonard* v. *Rose*, '65 Cal.2d 589, 593 [55 Cal.Rptr. 916, 422 P.2d 604]; *Brinkmann* v. *Liberty Mutual etc. Ins. Co.*, 63 Cal.2d 41, 44 [45 Cal.Rptr. 8, 403 P.2d 136]; *Chance* v. *Lawry's, Inc.*, 58 Cal.2d 368, 384 [24 Cal.Rptr. 209, 374 P.2d 185].) We need not restate the facts again. It is sufficient to say that, in our opinion the facts stated were sufficient to warrant the finding necessarily implied in the jury's verdict, namely, that appellant's conduct was wilful, intentional and done with reckless disregard of its possible injurious results, and that thereby malice in fact was established.

Other points raised in the petition for rehearing attack our statement of the evidence. We have again compared our statement with the record and find nothing in it to warrant appellant's charges of overstatement, distortion or error. It is true that, as appellant argues, we minimize the significance of evidence in its favor. We considered the evidence in the light most favorable to respondent, who prevailed below, as required by the long-settled rule to which we have previously

referred. We gave respondent the benefit of every reasonable inference that could be drawn from the evidence, and where the evidence was in conflict, we presumed that the jury resolved all such conflicts in respondent's favor. Where sufficiency of the evidence is an issue, a summary of the evidence abstracted from the record and stated in the manner required by the standard we have described rarely makes pleasant reading for the losing party.

Our opinion did not dispose of appellant's contention that Civil Code section 3294, which authorizes punitive damages for "... oppression, fraud, or malice. ..." is unconstitutional because it contains no standard by which to measure the punishment, nor any limitation as to the amount to be awarded. We find no merit in this contention. A plaintiff's right to exemplary or punitive damages, when the defendant's conduct justifies the award, is generally accepted, and may exist even in the absence of statute. Some authorities have said that the right to such damages is as old as the right to trial by jury. When allowable, the amount to be awarded lies within the sound discretion of the trier of fact (*Scott* v. *Times-Mirror Co.*, 181 Cal. 345, 366 [184 P. 672, 12 A.L.R. 1007] ; *Brewer* v. *Second Baptist Church*, 32 Cal.2d 791, 800, 801 [197 P.2d 713] ; Rest., Torts, § 908) but must bear a reasonable relationship to actual damages suffered. (*Wilkinson* v. *Singh*, 93 Cal.App. 337, 345 [269 P. 705] ; *Plotnik* v. *Rosenberg*, 55 Cal.App. 408, 410 [203 P. 438].)

Our statute does no more than recognize the right to punitive damages where the defendant has been found guilty of wrongful conduct showing fraud, oppression or malice.

As to malice, we noted in our opinion that it may be established by a showing that the defendant's wrongful conduct was wilful, intentional, and done in reckless disregard of its possible results. It cannot be found in a vacuum. Its existence depends upon facts proven. Where, as here, its existence as a fact is supported by evidence in the record, we see no offense to the Constitution, and no deprivation of any constitutional right of appellant in committing the assessment of such damages, including the amount to be allowed, to the sound discretion of the jury.

Appellant's petition for a hearing by the Supreme Court was denied September 7, 1967.